And we'll turn to the next case on the calendar today, 20-1185, New York State Teamsters v. C&S Wholesale Grocers. Mr. Meehan? Yes, Your Honor. Edward Meehan. Thank you, sir. Edward Meehan on behalf of Appellant, the pension fund. Retirement and retirement savings are central concerns to many Americans. And in time, they will be central concerns for every American. Congress passed the MEPA statute to protect multi-employer pension funds. The pensioners and beneficiaries of those funds and other contributing employers, as well as the government through the PBGC, to protect all of those constituent groups from unpaid withdrawal liability situations. The transaction that we're talking about here was designed to thwart those congressional purposes. C&S argues if liability is imposed on them in this transaction where they say, well, we just purchased some assets from another company in our industry, that if you impose liability on us, you'll impede the free flow of capital. Because this was simply ordinary commerce. Well, this transaction was anything but normal. Just a quick dip into the record. We have a former co-president who prior to that was the general counsel of the buyer, C&S, who let C&S form his own consulting firm and became the senior advisor for the seller, Pentran. He worked in our view as a double agent. He was providing information to the buyer unbeknownst to the seller. One example from the many in the record appendix 383 and 384, some emails between Mr. Gross and Mr. Newbold at C&S being in charge of this transaction on the buyer's side. We have a revolving door of senior officers. We have an individual, Dan Mahoney, who was the general counsel at C&S. At the same time, he was the general counsel at Pentraffic for an overlapping period before he eventually went to Pentraffic. The CEO at the seller at Pentraffic who signed off on the transaction that brings us here today came from C&S, Greg Young. We take a look at the special appendix, the supplemental appendix 114. That's the signature page for the asset purchase agreement to see Mr. Young's signature. Overall, what we're talking about is a transaction that should be viewed in its context, which is what the cases teach us, that we look at the overall circumstances, the totality of the circumstances. What we see is that the transaction here, which we believe the district court looked at in very narrow isolation, was focused instead as a multi-stage acquisition of certain lines of the business by C&S from Pentraffic. And we know that because that's how it was described by the CEO and primary owner of C&S. And if we look at appendix 414 through 418, there are references to what is described as a plan. Now that this is in September of 2008, the C&S was already doing the procurement piece and they intended to take over the distribution piece as soon as Pentraffic's contract with its union expired. Why the gap? Because of what brings us here today, unpaid withdrawal liability and the concern that C&S would end up being stuck with it. On the Pentraffic side. I'm going to interrupt for a second, please. This is, this is Judge Carney. I have a question for you. My understanding from the papers that have been submitted in the district court's discussion is that the grocery business as a whole has three main elements, wholesale procurement, warehousing and distribution and retail sales. Is that right? Yes. Yes, that is. Yeah. And I understand from the description of Pentraffic's operation that they were  primarily in wholesale procurement. But that C&S in looking to make an asset purchase, for example, could do so by buying warehousing and distribution or buying a retail sales operation or shifting. There's no legal or other requirement, business requirement to be, have the vertical integration of all those three functions. Is that correct? That's agreed. But you can have just a re, right. So if that's so, I'm having a difficult time understanding what the source of any obligation would be for C&S to purchase the warehousing and distribution operation from Pentraffic and not just the assets that it wanted and to continue to serve the independent retail sales customers. What was the source of that obligation? We are not saying that they were obliged to buy the, the, uh, the warehouse operations. What we are saying is that they developed with, um, certain folks at Pentraffic, a plan to take over these lines of business and they did it in a multistage transaction. The way they structured. So you're saying that they, they did. So you say they structured this to evade, withdrawal, liability, responsibility, or withdrawal liability. Evade, evade or avoid. They never had, they never had the liability. They were acquiring assets from a company that had the liability. And what we're saying is that under the way the successorship doctrine works, the, and the policies associated with that, as well as the way evade or avoid works that, that once they set about to take on the business that they effectively succeeded or should be deemed to have succeeded as a matter of law at two Pentraffic obligation. And that if you look through the form of what they did with the warehouse and go to the substance, they effectively were taking it over and trying to avoid the liability. And the reason we say that is if you look at what we refer to as the 3PL, CNS had never done a transaction where they hired someone else to do what they prided themselves on doing. And if you look at that document, the term of that document indicates that Pentraffic was not permitted to withdraw from it until after the collective bargaining agreement that Mr. Cohen referred to their CEO as being the timing for them taking over distribution for when that would end. So that 3PL, which CNS had never done before was designed to remain in place until the CBA expired, by which time there would be a situation that they would not, CNS would not be taking over a unionized labor under a CBA that would have a successorship provision. So what we're really saying in our concern with how the district court analyzed this is that there was a failure to look at the broad spectrum of the totality of the circumstances here. Excuse me, you have a minute. The ultimate purpose, this is Judge Raji, the ultimate purpose of all of this inquiry is into whether or not CNS can voluntarily be held to be an employer responsible for this withdrawal liability. There's no doubt that they didn't want to assume that they wanted to structure a transaction so that they did not assume this, this withdrawal liability. And to the extent that the seller Pentraffic remained obligated to provide the warehouse services and was paid for that and was, you know, the employer of the longshoremen here, why, why didn't the responsibility rest simply with them? Help me out. Well, under Herman and other cases interpreting it, the transaction here does not limit liability to an employer or a seller. It's any party to a transaction. And so we think it's much broader than the concept that you have to be an employer, but of course, under some of the successorship. Well, to the extent that, that you've done it in order to evade or avoid liability, that wouldn't be their liability because they didn't have it. But to the extent they were looking to help Penn evade or avoid its responsibility under, I mean, I'm, I'm not sure that that in these circumstances CNS avoiding a liability it never had is the proper focus. Well, if the evade or avoid concept, your owner would apply to any party to the transaction. Well, who had an obligation? Who had an obligation? The liability has been extended to buyers as well. If it's, if the transaction is structured in a way to avoid the buyer picking up the liability that would otherwise flow. Because the buyer in those, because in those circumstances, the seller gives up the obligation when he sells the, in this circumstance, we're left with a seller who is left with the responsibility. And in those circumstances, I would think that you would need to point to evidence that CNS was aiding and abetting Penn traffic in not meeting its obligations or am I missing something? It's broader than that, your honor. First, we think there is evidence here that there was actual evasion, which as, which indicates a basis of deceit or dishonesty or wrongdoing. But what we don't need evasion. Avoiding is simply taking an action to not take on a pension liability. And in this area, Congress has indicated that the focus is to avoid withdrawal liability going unpaid. So it is perfectly appropriate to, in a sense, pierce through these transactions to look at what is the substance that is the heart of the successorship doctrine, which also gives us a basis for saying that the way they structured the transaction, the benefits received, the assets purchased and the fact that the Syracuse warehouse where the unionized employees were, was designed for the benefit of CNS during this 3PL period. Under the successorship doctrines, when you consider the totality of all of those circumstances and the record, which is replete with indications that CNS wanted the distribution piece, but wanted to do it in a way that would avoid, if not evade, withdrawal liability. It all adds up, we think to a record that is very clear that the liability should flow to the unionized employees. So when the district court evaluated the successorship doctrine, for example, at the motion to dismiss stage, it accepted that it was appropriate in this circuit to look at successorship in the context of, did you have notice of the withdrawal liability, which the district court correctly concluded that yes, CNS did. And let's look at the totality of the circumstances. Was there any substantial continuity at the motion to dismiss stage? That's the way the two part traditional test was presented. By the time we got to the summary judgment stage, and remember your honor, we're here on summary judgment where every inference should be drawn in our favor. The district court inexplicably having identified an important part of analysis to drill down onto what is the special relationship of the workers, unionized workers to the work that was performed and this transaction. By the time it got to the summary judgment stage, for some reason without explanation, it broke that portion out, never examined the 3PL and concluded that the simple fact, which no one disputes that the defendant quote did not actually employ the workers at the Syracuse warehouse. That's from page nine of the summary judgment that that favored CNS. Our point is the structure here of the 3PL gave them the CNS, the functional benefit of employing the workers at the warehouse. And it was designed as a temporary workaround until the CBA expired in February of 2011. And when we look more broadly, what's one of the points we get from CNS on the substantial continuity is, and it was reflected in the summary judgment opinion is, well, the customers that they picked up through the wholesale business that were serviced out of that warehouse represented only 30% of the wholesale line of business. And CNS makes the argument that quote by definition, end quote, 30% is not substantial. There is no such definition in that regard except when we look at the Supreme Court in Fall River, the Supreme Court has already defined for us that a 30 to 40% continuity in customer relationships or a line of business is a factor that satisfies the transfer in that sense under substantial continuity. And so we think it is defined in our benefit by the Supreme Court in Fall River. And that was not- How about the Division 1181 case in which we said that the Department of Education, which exercised substantial control over its contractors for escorts and bus drivers, still was not an employer that was subject to the obligations of the employer towards a pension plan? Your Honor, we do not take the position that every time you subcontract that it somehow creates an employment relationship. We are saying only as in 1189, there was- Well, why not here? What's your best case then for the proposition that this kind of subcontract, we need to look behind it to something else? I'm not quite sure what. I mean, they had a price, they paid for the services, they did not acquire the equipment, they didn't acquire employment relationships with the people who were providing those functions. It was for a limited period of time and it was a segregable portion of the business. Why weren't they entitled to do that without opening up this huge liability? That you're trying to place on them. We're not trying to place it on them. What we're saying is that under the case law, that the totality of the circumstances should have been examined and it wasn't. What Your Honor has mentioned is- But the court did look at the substantial continuity factors. And I mean, the equipment used in the warehouse wasn't acquired. The lease of the warehouse wasn't acquired by CNS and the employment relationships weren't entered into by CNS. They hired a, you know, it was a turnkey operation. Please provide for this limited set of customers, the warehousing distribution operation for a limited period of time. Why is it, why is that not a reasonable basis for rejecting the employer argument that you're, you're making? That they were actually the employers of these individuals? Well, Your Honor, it's broader than that. It's not that we're simply saying that they should be deemed to be the employer. We are saying they should be deemed to be the successor because that factor that Your Honor is mentioning is one of the factors that courts have looked at. But there are very long list of factors. All of the factors in the alter ego test, other than the bad intent are also considered to be sources of information in the context of successorship. Here we had the district court that identified several factors that the motion to dismiss stage did not consider one of them, then focused narrowly on just a few of the factors that the cases do consider. There was really no analysis of the price that was paid for the business, the profit stream that was, that was obtained, the hiring of former senior executives, the lack of arm's length here by, but what we think is the interconnections, a history of an anti-union animus, the control and ownership of all of the inventory in the warehouse by CNS, the continuity of, of customers where the district court seems to have accepted without analysis that a 30% continuation cannot be substantial. When of course the Supreme Court identified in fall river that it certainly can be as one of these factors. It even one of CNS's managers thought that that the Syracuse warehouse was formally actually part of the CNS network. We have, is there any case in which, excuse me, is there any case in which the concept of being a successor in part, for example, has been adopted in this, the 30% may be substantial, but it still falls short and the evidence seems to fall short of the district court found establishing substantial continuity in in business operations as to the whole operation. Well, we're not saying that CNS is the successor and traffic for its entire business and any and all purposes. For example, Penn traffic operated stores. Now we have pointed out the evidence that, that the CNS worked as part of what we you know, referred to as the master plan to coordinate with another company in the, in the grocery industry concerning a merger between, between traffic and tops and how the procurement for that combined entity would all someday be part of CNS. And that was part of this. But the narrow focus, if I may, your honor to your answer, your question is we, we are not saying that all lines of business at Penn traffic fail to CNS, but there were distinct lines of business at, at, at Penn traffic at CNS sought to acquire and, and effectively did through this means just as in fall river, only one line of business was taken on there by, by the buyer. And that line of business represented 30 to 40%. And that factor was deemed to be sufficient to show substantial continuity among other factors in that case for that line of business. And that's all we're saying is the lines of business at issue here, there was, there was sufficient continuity so that for this liability, and we're not arguing about any other liability that for this liability, given, given all of those public policy concepts and the prior cases that the liability for this withdrawal liability that has not been paid should fall to CNS. And it, and as another example from the district court's analysis, the district court did point out that, well, the pension fund here did receive roughly a $5 million payment on its $63 million claim. What the district court seemed to suggest was that was now a brand new rule that you need to have first immediate insolvency because they did point out, the district court pointed out that, that the date of the asset purchase agreement and then the closing of the district court seemed to draw upon the Herman case where there happened to be a one month gap between that acquisition and the close of operations in that case to establish this seeming rule that you need immediate insolvency. And the district court seemed to suggest that it has to be a complete failure to pay anything on the withdrawal liability here was eight. It was 8% of the money was paid by the seller. Thank you. Thank you. I think we've given you a little more than a little bit of extra time. I noticed that and I very much appreciate it. Mr. Roth. Thank you. May it please the court. This is Yaakov Roth for defendant, Applee CNS wholesale grocers. Your honors, this case has a lot of rabbit holes, but at its core it's really fairly simple and the material facts are all undisputed. Pen traffic operated a warehouse in Syracuse and pen traffic made pension contributions for the teamsters who worked there during the great recession. Pen traffic went bankrupt and left an unfunded pension liability to that teamsters fund. The fund is now trying to collect that debt from an adjacent party with deeper pockets at CNS, but your honors, CNS never owned the warehouse, never operated the warehouse, never controlled the warehouse, never employed the teamsters, never contributed to the fund on behalf of the teamsters, never entered a collective bargaining agreement with the local teamsters union. The only nexus. But what the record does show is that originally you wanted to run the warehouse. You wanted to buy the whole operation. It was specifically to avoid the withdrawal liability obligation that you came up with another way of doing this. And certainly you were entitled to do it. But after you did it, as I understand it, you reimbursed CNS for their pension contributions, which seems a curious thing to do if you weren't, um, weren't involved in, um, that obligation. What, why isn't that something that creates a question here? Yeah, sure. Your honor. So what happened with the warehouse and you're right, initially there were discussions about CNS buying the warehouse. That would, that would have required one of two things to happen. Either a Penn traffic could have withdrawn at that point from the pension fund and incurred the withdrawal liability and paid it. CNS could have taken over the operation fresh and traffic didn't want to do that. So it didn't have the cash at that point, free cash to incur that liability. At that point, the other option would have been for CNS to take over the collective bargaining agreement to step into the shoes of Penn traffic, become the employer of record, operate the warehouse. And in doing that would have exposed CNS to the contingent liability associated with the pension fund, which CNS didn't want to do because it would have made the whole transaction financially irrational. And so Penn traffic had to keep operating the warehouse. Penn traffic did want to sell the wholesale business. And so what the parties negotiated was that Penn traffic would keep the warehouse and traffic would keep running it. And CNS would pay Penn traffic for the services provided, the warehouse services provided to the wholesale customers who became CNS's customers. Now that was a part of the negotiations. The terms for that independent contractor relationship was that CNS paid for a paid for the services based on the actual costs of operating. That was the way the formula worked. It wasn't specific to the pension. It was just the overall costs of the warehouse. CNS paid sort of its share, which was a minority share. That's not any different from really any other cost plus or reimbursement based contract, which this court in division 1181, and every other court of appeals to consider the question, which is seventh in the trans personnel case and the eighth circuit in the Ream case, all of those courts have said that does not turn the company that's paying for the services into an employer that's exposed to withdrawal liability under ERISA, you know, for its contractor. And so this is, that's really the only nexus here between CNS and the warehouses, that type of independent contractor relationship that again, division 1181 said is not enough to turn to expose the party to withdraw liability. So the fund has a couple of theories to try to get around that, is try to shift the liability that the statute puts on Penn traffic, try to shift it to CNS. And the lead theory, at least in, in the opening brief was this evade or avoid argument that CNS evaded the liability, avoided the liability by not taking over the warehouse. And you know, that is just legally wrong because the statute is not concerned with employers who don't assume obligations under ERISA. It's concerned with employers who are trying to get out of their obligations that they would otherwise owe. Could I, could I interrupt for just a second? Sure. So, so part of the narrative that your adversary writes for us is that this is a close knit community. There were people who had been working at high levels for both CNS and for Penn traffic that CNS underpaid substantially for the assets that acquired for the wholesale operation and for the customer list and so on that that maybe helped contribute to the bankruptcy of Penn traffic not long after the asset acquisition by CNS. And in the interim in an effort to avoid the pension withdrawal liability, while yet maintaining all of the elements of value of the assets that are acquired in the customer list, it used this device, which is this cost plus contract to fill the gap until those the CBAs had expired and the liabilities maybe could be hoped to be safely extinguished. And then CNS was, you know, could fulfill the whole kind of integrated operation without fear of having liability imposed on them. And that seems like a method of avoiding obligations, pension obligations undertaken by Penn traffic. And you know, if the underpayment allegations are correct, then it gave Penn traffic less by way of assets to cover those obligations. And, you know, maybe writing the story is this kind of integrated whole, there is a sense in which there is a maybe stepped over the line in avoiding and evading the obligations that was helping Penn traffic maybe to avoid those and while taking on all that was good about Penn traffic and seeing it go into bankruptcy soon after. So what is inaccurate about that story, that narrative of the facts that we have before us? Sure. Your Honor. Well, I want to start with what's legally inaccurate because a whole bunch of facts in there that I think are not supported by the record, but I'll start with the legal point. You know, I think there are, there are two ways in which a company, an employer can try to evade or avoid its withdrawal liability. One, which is the more common way is to try to shift the liability. You know, that didn't happen here. Penn traffic kept the liability. The other way, which I think the fund is trying to sort of analogize to with some of these cases from this court, which is basically a fraudulent transfer of assets approach. So you're not getting rid of the liability that you owe, but you're giving away all the assets so that they're beyond the reach of the pension fund and essentially defrauding the fund and preventing funds from looking to those assets to recover. And I think some of the allegations are trying to suggest that that sort of Penn traffic was trying to evade its liability by bankrupting itself and giving away its assets to CNS. And therefore you can go and kind of claw those assets back. Your Honor, I just, that's really not the theory that was advanced in the complaint or below or even in the opening brief in this court. I mean, the fund theory has really always been focused on CNS's intent in structuring the transaction, the way it's structured it. And the fund didn't really make any allegations about Penn traffic being in on it. Penn traffic being sort of conspiring to give away its assets. It never really explains why Penn traffic would have had any incentive to do that. Certainly the record that came out in discovery didn't support that. What it showed was that Penn traffic was trying to get through a very difficult financial time by turning some of its assets into cash so that it could have more liquidity and then hopefully try to shore up the core business, which was a retail operation. Now, of course that didn't end up working out. Can I interrupt? If I could interrupt for just one second. Was there any allegation or claim of this nature made in the course of the Penn traffic 2008 bankruptcy? Yeah, well that's an excellent question because as we sort of explained in the brief, a fraudulent conveyance type of theory is the type of claim that would have had to have been brought in the Penn traffic bankruptcy because it's not limited to the pension fund. It's about, you know, if you take this theory seriously, it means that Penn traffic was giving away its assets and depriving all creditors of access to those assets. And that's the type of thing that this court in the St. Paul case said would have to be brought by the bankruptcy trustee and that binds the creditors. What I can tell you is in the record is a report that was done by a law firm hired by the unsecured creditors committee to analyze, you know, is there an evade, is there a fraudulent transfer theory that we should be pursuing based on this 2008 transaction? You have one minute left. Thanks. And, and, and they did not pursue that. The trustees did not pursue that theory. The report found that it was, would not be supported. So I think that's really why the fund didn't expressly frame its claim that way in this case, and instead tried to focus the attention on CNS's intent in how CNS structured the transaction. And again, you know, that, that just doesn't work for the same reasons explained by the first circuit. For example, in the sun capital case, you know, the transaction was structured in a way that did not result in the assumption of the liability by CNS, but that's not what the statute is about. And the statute doesn't give the court any way to remedy that because you can't, the statute doesn't allow the court to create a transaction that didn't otherwise occur, which is really what the fund is kind of getting at here, which is, well, you, you know, you would have bought the warehouse if not for this eight figure liability. And, you know, even if that's true, court can't pretend that we, you know, CNS did buy the warehouse. And so I think, you know, for that reason, the claim is just legally doesn't have anywhere to go. Mr. Roth, this is Judge Cabrera at the risk of having you retrace some of what you've already commented on. Appellant's claim in effect that CNS did not pay fair market value for a patent traffics wholesale business in the 2008 transaction. Is that a fair characterization of, of their claim? That is an allegation, but I really don't think that's, that's their claim. I think the claim is really that CNS structured this deal in a way that did not result in taking over the warehouse, right? It bought the wholesale business, did not buy the warehouse. And so Penn traffic kept the warehouse. And that meant, you know, CNS never had to step into the shoes of the liabilities associated with the warehouse. They do make it out. There is an allegation about, you know, the price that was paid. But I, I'm not really sure how it fits into the theory. And how do you respond to that claim? Well, I think we respond in two ways. One, it's not factually supported by the record. So what we have is and, and you know, if the court's interested in this in the competing statements of material fact that are in the appendix there was a report done several, you know, while before the transaction that said something like wholesale business might be worth between 50 and $70 million. Then there was the analysis done by the unsecured creditors committee after the fact that said, no, fair market price is 30 to $50 million and the price was 43. So right in the middle. So I don't think there's really, you know, there was no fund didn't hire an expert to do an analysis of this, you know, in this case, that was never the focus of the, of the litigation below. The focus was about what was CNS trying to do by not buying the warehouse. And the fund was trying to prove, you know, CNS didn't want to take on the warehouse, which we admit CNS didn't want to take over the warehouse on those terms. It would not have made any sense. I mean, if you think about it, the liability they're seeking here is over $60 million. The purchase price that was paid was, you know, 43. So if there's no question that if buying this business meant taking over that liability, the sale wouldn't have happened. If the sale wouldn't have happened, you know, Penn traffic wouldn't even have had the opportunity to use this infusion of cash to get it back on its feet and continue as a, as a more stable financial footing. Along those lines, there might've been another issue raised, which was whether you were paying for your market value for the warehousing services that Penn was providing you. And I did not see, unless I overlooked it, any allegations about that. Correct. There were no, there were no allegations about that. And it was, again, it was done on a cost basis. So, you know, I think it was sort of an open book of here are costs, your share is this much. But my point is there's no suggestion that you were getting the warehouse services that you claim remained in the hands of Penn at anything other than fair market value. That's correct. And the payment for that work was about $14 million over the course of the slightly over a year. So, you know, in a sense, you know, I heard the fund council arguing that, well, you know, CNS took over the customers of the warehouse. That's not really true because Penn traffic was still doing all the work. You became the warehouse customer. We be exactly, we replace, exactly. That's exactly right, Your Honor. We really replaced the customer, but we continue to pay for the services, which continued to support the pension fund because the Penn traffic was still making the contributions. So this is not a case like, you know, the ninth circuit's decision in Resilient Floor, for example, where the problem the court had was with impairing the funds contribution based by, you know, taking the work, moving it to a non-union shop where there's no pension contributions being made and the fund is left with nothing, you know, here, the work continued, the contributions continued. It's just that Penn traffic ended up failing, which of course is unfortunate, but it meant that all the creditors, you know, didn't get fully paid on what they were owed. Mr. Roth, would you perhaps address the substantial continuity theory as a basis for success or liability? Why shouldn't we recognize substantial continuity as a basis for success or liability? Thank you, Judge Cabranes. I'd be happy to address that. I don't think the court necessarily needs to reach it, although I'd be happy if the court did. You know, the historical and common law well-established rule for success or liability in the context of an asset sale was identified by this court in national services case, which is generally speaking, the liabilities do not transfer with the assets subject to four well-established exceptions that are not applicable here. And the general rule when you have a federal statute that does not specifically speak to a question like this background question of corporate law is that we look to the well-established common law rule. The whole substantial continuity theory of successorship has been pulled out of a completely different context. The Supreme Court developed it to answer a different question under a different statute. And the question was when you have a change in ownership in a business, but the employees are still there doing the same work, does the new employer have to recognize the union that existed before the sale? And the court said, yes, if it's substantially the same, you know, if it's the same people doing the same work, you know, you can assume that they still want the same union to represent them and you've got to bargain with them. You don't have to take the terms that were previously negotiated, but you've got to sit down with that union. Now that makes perfect sense, but it really has nothing to do with statutory liabilities like withdrawal liability. And there just is not any legal basis for taking that doctrine and then exporting it to a whole bunch of other statutes that don't speak to it. And I would just prefer the court, not only to judge LaValle's concurrence in national services, where he explains this in a lot of detail, also judge Easterbrook's concurrence in the recent McCleskey case, judge Centel has a good concurrence in the Holland case where these judges explain the historical origins of this and how it just does not fit when you try to drop it into these other statutes. That's also, I think the answer to let me just interrupt for just one second. So nonetheless, we have very protected purposes of ERISA and the multi employer amendments. And we have a pretty well-established scorecard adopting the approach of successor liability on withdrawal liability in circuits across the country. As far as I know, is that right? Yeah, Your Honor, there are two circuits, the seventh and the ninth have extended it to this context. And I think, you know, as we say pretty openly in the briefing, you know, we think they're just mistaken about this. It's out of step with the more modern approach to federal common law and this court's decision in national services, I think takes a different approach to that question. You know, what I was going to say was that I think this also is partly an answer to your Honor's question about, you know, partial continuity and how that might play out. You know, that doesn't really exist in the cases. I think that's because, you know, they all envision it as an on-off switch. I think that's because of the historical origins of it, right? You know, you're asking, do I have to sit down with this union or not? You can't sit down with them 30%, you know, if yes or no. And so it makes sense to have a bright, you know, kind of a line where you say, yes, you know, there's enough continuity that you need to recognize the union or no, you don't. But once you start trying to apply it to these statutory liabilities, monetary liabilities, it just doesn't really make much sense. So the seventh circuit decision, that's a trans personnel, is that right? It's been on the books for quite a while. Yeah. It's not the trans personnel. That's a different, that's a different case, Your Honor. But they, they're mostly from the last decade. They're not, they don't go whole far back, at least in ERISA. You know, there are cases extending substantial continuity to other statutes, you know, that go back to the eighties because that's really when the, you know, the Supreme Court decisions are from the seventies and then it kind of spread. The ERISA cases are more, at least the withdrawal liability cases are much more recent. And this court of course has not spoken to the issue other than in national services, which I think has a lot of doubt on it. You know, I don't want to, I don't want to mislead anybody though, that, you know, the district court adopted the theory at the motion to dismiss stage, allowed the case to go to summary judgment, to develop the facts on this theory and then rejected the theory on its own terms. So I don't want to suggest that, you know, we need to win that legal framework question in order to affirm the district court, you know, the district court recognized there isn't substantial continuity here regardless because CNS just never took over the warehouse, you know. All right. That's very helpful. Thank you, Mr. Ross. And Mr. Meehan has really taken his rebuttal time, but why don't you take a minute, Mr. Meehan. Of course. Thank you, Your Honor. And then just very briefly, in a couple of points, every court that has looked at this issue has agreed that it makes sense to apply the successorship doctrine in the ERISA space and with respect to withdrawal liability and the seventh circuit has been doing this since 1995. And that's the Simpkin case. I think you also heard from counsel for CNS that it sounds like we have a lot of disagreement over what the record is, what the record shows, what the record means. The solution for that, of course, would be to remand for trial. We also would point out just very briefly that one of the, one of the legal analysis errors that the district court may hear, I touched on it obviously, but now it's been reinforced, is CNS is arguing that you should look at absolutely nothing whatsoever except the warehouse. That is too narrow of a slice. If you're going to look at a transaction, you need to look at it and it's complete. And here it was, they obtained procurement. They then were focusing upon distribution and they had a broader plan to also expand the warehouse to combine with another company. And when traffic began to experience problems in September of 2008, they rewrote the supply agreement to put in three pages of bankruptcy protections because they knew bankruptcy, CNS now was likely in the near future and their plan changed slightly so that they could then take over some of the operations themselves and use the 3PL as this workaround on the withdrawal liability. So our essential legal point is that the analysis that the district court, although council has said, the district court adopted the substantial continuity test, the district court did not fully apply it because it looked at only a couple of the factors and it excluded including one factor that had identified as really central to the analysis. So our view is the record establishes the test and failing that, that the proper course here is to remand for trial so that all of these issues can be brought forward. Thank you very much, Mr. Mann. Mr. Roth, we'll reserve the decision.